O

I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL. POSTAGE PREPAID, TO ~~ALL COUNSEL~~ *Petitioner*
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD IN THIS ACTION ON THIS DATE.

DATED:  9/11/09

DEPUTY CLERK

FILED
CLERK, U.S.D.C. SOUTHERN DIVISION

SEP 11 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

KEVIN PATRICK KENNEDY,                    ) Case No. SACV 09-0611 RNB
                                          )
                    Petitioner,           )
                                          ) MEMORANDUM OPINION AND
        vs.                               ) ORDER THEREON
                                          )
KATHLEEN DICKENSON,                       )
                                          )
                    Respondent.           )
                                          )
_____  )

On or about May 18, 2009, petitioner constructively filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein, along with several attachments ("Att.").[1] The Petition included a "Motion for Evidentiary Hearing; Appointment of Counsel; Conduction of Habeas Investigation to Include Forensic Testing of Evidence," which the Court denied on June 2, 2009. Following an extension of time, respondent filed an Answer ("Ans.") to the Petition, including a supporting Memorandum of Points and Authorities, on August 5, 2009. Petitioner filed a Traverse ("Trav.") thereto on August 31, 2009.

---

[1]     The Petition did not include a proof of service page. May 18, 2009 is the signature date.

1

1    Thus, this matter now is ready for decision. For the reasons discussed hereafter,

2    the Petition is denied.

3

4                          **PROCEDURAL HISTORY**

5    On February 4, 2005, an Orange County Superior Court jury found petitioner

6    guilty of stalking with a prior stalking conviction (Count 1), assault by means of force

7    likely to produce great bodily injury (Count 2), and making a criminal threat (Count

8    3).[2]  The trial court subsequently sentenced petitioner to an aggregate determinate

9    prison term of fourteen years, four months.

10   Petitioner appealed his conviction and sentence to the California Court of

11   Appeal raising several claims, including a Miranda[3] claim that generally corresponds

12   to Ground Three of the Petition herein.  In an unpublished decision filed on November

13   2, 2006, the California Court of Appeal ordered that the 16-month term imposed for

14   the criminal threat count be stayed pending completion of service on the other two

15   counts, but it otherwise rejected petitioner's claims and affirmed the judgment as

16   modified.  In his ensuing Petition for Review to Exhaust State Remedies, petitioner

17   raised five claims, including his Miranda claim. The California Supreme Court denied

18   the Petition for Review on January 17, 2007, without prejudice to any relief to which

19   petitioner might be entitled after the United States Supreme Court decided the then-

20   pending Cunningham case.

21   Petitioner's first collateral challenge to his conviction took the form of a

22   petition for writ of habeas corpus constructively filed in the Orange County Superior

23   Court on or about January 7, 2008 (signature date).  Petitioner purported to allege

24

25   ───────────────

26   [2]     Petitioner had been charged in a fourth count with making a criminal
     threat, and the jury found him not guilty of that count.

27   [3]     Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694
28   (1966).

2

therein twenty separate grounds for relief, including a "factual innocence" claim that generally corresponds to Ground One of the Petition herein, and two ineffective assistance of trial counsel claims that appear to encompass Ground Two of the Petition herein. Petitioner also reasserted and reargued his <u>Miranda</u> claim. The Superior Court denied the Petition in an Order issued on February 29, 2008. Petitioner next constructively filed a habeas petition in the California Court of Appeal on or about May 15, 2008 (signature date) raising the same twenty claims that he had raised in his Superior Court habeas petition. The Court of Appeal summarily denied that petition without comment or citation of authority on June 26, 2008. Petitioner then constructively filed a habeas petition in the California Supreme Court on or about July 28, 2008 (signature date) raising the same claims, which was summarily denied without comment or citation of authority on February 18, 2009.

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

The following summary is taken from the "Facts" section of the California Court of Appeal opinion:[4]

*Kimberly Morgan, a member of Calvary West Grove Church, greeted newcomers at the church as part of her responsibilities there. In May 2002, she met*

---

[4]   The Court notes that recent Ninth Circuit cases have accorded the factual summary set forth in an opinion of the California Court of Appeal a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). See <u>Slovik v. Yates</u>, 545 F.3d 1181, 1183 n.1 (9th Cir. 2008); <u>Moses v. Payne</u>, 555 F.3d 742, 746 n.1 (9th Cir. 2009); <u>Tilcock v. Budge</u>, 538 F.3d 1138, 1141 (9th Cir. 2008); <u>Mejia v. Garcia</u>, 534 F.3d 1036, 1039 n.1 (9th Cir. 2008). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Here, although petitioner maintains his "factual innocence" of the Count 3 criminal threat charge and has requested that his expert be permitted to conduct forensic testing of the taped phone message giving rise to the Count 3 criminal threat charge, he has not proffered any clear and convincing evidence to rebut the presumption of correctness applicable to the Court of Appeal's factual summary.

1   *[petitioner] one morning when he asked directions to the prayer room. She*
2   *accompanied him there, waiting outside while he entered and prayed. Afterwards, she*
3   *gave him her father's telephone number to call if he wanted to talk. Her father later*
4   *informed her that [petitioner] had called and expressed how lonely he was. Morgan*
5   *began phoning [petitioner] once a week as part of her "faith and belief" and learned*
6   *of his unhappiness. About six months later, they started dating.*

7       *Within a couple of months, however, [petitioner] began saying things to her of*
8   *a very disturbing quality: He phoned her once, telling her he wanted to buy an ice*
9   *pick and puncture her tires. He also revealed to her that he once burned down*
10  *someone's trailer because he heard voices directing him to do it. He also told her*
11  *that he had been charged with stalking simply because he had put a note on*
12  *someone's windshield which others interpreted as threatening.*

13      *In March 2003, Morgan agreed to go with [petitioner] to El Cajon to hear her*
14  *favorite radio minister. Once there, however, they argued, resulting in [petitioner]*
15  *throwing her Bible at her with such force that it split her lip. The police were*
16  *summoned but Morgan declined to file a complaint.*

17      *About six months later, Morgan was at home, awaiting delivery of her new*
18  *refrigerator. She told [petitioner] he was welcome to the food in her old freezer so*
19  *it would not be wasted. He arrived and became upset with her so she asked him to*
20  *leave. He grabbed her in a <u>chokehold</u> and then slammed her against the security*
21  *door, damaging it and cutting off her air supply so that she could barely talk. She*
22  *managed to ask him if he was going to keep hurting her, and he released her. Her*
23  *back, neck and shoulders were hurt by the incident and she discovered bruises on her*
24  *throat where he had held her in the stranglehold.*

25      *On New Year's Eve, Morgan informed [petitioner] that she would not date him*
26  *anymore. Within days, [petitioner] appeared at her job, embarrassing her in front of*
27  *her supervisor by yelling obscene names at her and demanding certain documents*

28

1    *back.[5] At this point, Morgan was seriously frightened.  Later that day, she found*
2    *[petitioner] waiting for her outside her apartment.  She was with her daughter, so*
3    *Morgan left without entering her home and waited until [petitioner] finally departed*
4    *the area.*

5          *Within a few weeks, [petitioner] phoned Morgan with a surprise Valentine's*
6    *Day greeting:  He told her he wanted to knock out her teeth.  She ignored the threat*
7    *although finding it rather unnerving.   A few days later, Morgan was with her*
8    *17-year-old son, Joseph, when [petitioner] approached them at a store. He demanded*
9    *she speak with him; she said they would have to talk later.  He then started chasing*
10   *her around the aisles and cash registers, insisting she return his documents. Joseph*
11   *attempted to intercede, but [petitioner] merely brushed him aside.  Meanwhile, the*
12   *police were called, but Morgan was in a quandary: She wanted him arrested but*
13   *feared his retaliation, so she declined to make a citizen's arrest.*

14         *Morgan and [petitioner] continued communicating, and she agreed to*
15   *accompany him to see the film, "The Passion of the Christ." However, once they were*
16   *at the film, [petitioner] became upset simply because Morgan had spoken briefly with*
17   *another woman.  His outburst required Morgan to leave the film and talk to him*
18   *outside for a while before he was sufficiently calm to reenter the theater and watch*
19   *the film.*

20         *Later that evening, Ahmed Nadvi, Joseph's father, came to visit him.  Morgan*
21   *no longer maintained a relationship with Nadvi, and was raising Joseph on her own.*
22   *However, Nadvi parked his car outside Morgan's apartment, and the next day,*
23   *[petitioner] phoned Morgan, remarking that he hoped she had been warm during the*

24

---

25         [5]   *Morgan had turned over certain documents belonging to [petitioner] to*
26   *investigators for the housing authority from whom she received assistance. An*
27   *unknown party had complained that [petitioner] was Morgan's roommate and thus,*
     *she was not entitled to the assistance funds.  Morgan used [petitioner]'s utility and*
28   *phone bills to prove he was not living with her.*

1  night.

2        Soon thereafter, [petitioner] and Nadvi spoke on the phone in mutually hostile

3  tones.  Nadvi informed [petitioner] that Morgan no longer wanted to see him, and

4  [petitioner] responded by saying he might have to burn down her home.  He added

5  that he did not want to return to prison, but that he might just have to do it.[6]  Nadvi

6  informed Morgan of the threat after [petitioner] left a diatribe on Morgan's

7  answering machine for Nadvi.

8        The following Sunday, Morgan was at church and saw [petitioner]

9  approaching her.  She managed to avoid him, but found another nasty message on her

10  answering machine at home from him.  He called her obscene names and told her

11  "you better watch your f---king back, bitch. Otherwise bad shit'll happen." Because

12  she knew of his background, his past history and his escalating violence, she feared

13  for her life and that of her son, Joseph.

14        Morgan reported this to the police, learning that [petitioner] had already

15  complained to them that _she_ was stalking _him_.  Taking Nadvi with her, Morgan went

16  to the police station and made a formal report.  The police arrested [petitioner] and

17  searched his apartment, finding a manual detailing all of his activities against

18  Morgan and listing all kinds of personal information she had not disclosed to him

19  such as her social security number, her mother's employment and her children's

20  personal information.  It also included a diary of his surveillance of her home.  Along

21  with this information was a copy of the stalking statute (see § 646.9) and a copy of

22  [petitioner's] prior conviction for arson.

23        Clifford Williams, an investigator for the Westminster Police Department,

24  interviewed [petitioner].  After waiving the rights recited to him, [petitioner] told

25  _____

26        [6]      The defense called the public service officer who took Nadvi's complaint.
27  The officer had recorded Nadvi as saying [petitioner's] actual threat was "it was a
   good thing his car wasn't working . . . because he'd come over and burn the house
28  down if he had a ride over there."

*Williams that Morgan was his former girlfriend. He maintained that he had tried to stay away from her since they had broken up in December 2003. He denied throwing the Bible at her, although admitting they had a fight in El Cajon. He likewise admitted he had conversations with Nadvi who had - without justification - accused [petitioner] of threatening to burn Morgan's house. He felt Morgan and Nadvi had concocted that threat because they knew [petitioner] had a prior conviction for arson. When Williams asked him if he had ever wanted to hurt Morgan, [petitioner] replied in a rather quizzical fashion: He asked, "Is this, um, guilty [ ] beyond a reasonable doubt, or is it a preponderance of evidence?"*

*[Petitioner] then listed what he deemed to be Morgan's faults. For instance, [petitioner] accused her of having been a woman of ill repute, a bisexual, a crack addict and a drug dealer. He admitted to leaving the messages on her answering machine in which he called her a whore and a bitch. He characterized this as merely "blowing off steam," never intending it to be a threat. He specifically denied making the phone call in which the voice told Morgan to watch her back. After hearing the tape of the message, [petitioner] opined the voice sounded like a man, Lucian, who had been Morgan's high school sweetheart. [Petitioner] felt that Morgan had used him and was framing him.*

*The prior conviction for stalking stemmed from an incident in 1997. Kimberly Carpenter was an alcoholic who attempted suicide and ended up in a hospital in March of that year. [Petitioner] met her there and invited her to attend Alcoholics Anonymous (AA) meetings. In May, she became intimate with him on one occasion. She immediately ended the relationship because she was married, and in response she received a series of sexually explicit, disturbing phone messages from [petitioner]. The messages seemed to evolve, becoming more threatening in nature. He once told her she was "dead meat" and that he'd put her in the hospital.*

*One day, [petitioner] arrived at Carpenter's home when her stepdaughter, Cassandra, was there babysitting Carpenter's three-year-old son. He tried to get*

7

*Cassandra to open the door to admit him, but she refused. He then tried to find out who she was and demanded she tell her father to meet him at work the next day: He had some papers the father should see. He said that if her father did not show up, the papers would ruin his life. He then ordered her to tell her stepmother that he would be back for her. He then called Cassandra obscene names.*

*That night, the Carpenters changed their telephone number. However, [petitioner] somehow discovered their new number and left a message the next day: "you can't change your phone number from me and you can't hide from me." In reporting all of these acts, Kim Carpenter had to reveal the brief affair she had with [petitioner], a revelation that damaged her marriage and sent her into another suicidal depression. She managed to continue her AA commitment, where, a couple of months later, she saw [petitioner] at a meeting. He approached her, expressing an interest in remaining friends. She refused. He left, but placed a note on her windshield that said, "I hope God gives you what you deserve. If he doesn't I will, you f---king bitch. You're a f---king slut . . . . [and a] goddamn bitch."*

## PETITIONER'S CLAIMS HEREIN

1.    Petitioner is "factually innocent" of the Count 3 criminal threat charge because it is not his voice on the phone message.

2.    Trial counsel rendered ineffective assistance in (a) failing to locate a forensic expert who could analyze the taped message giving rise to the Count 3 criminal threat charge, and (b) failing to have his defense investigator conduct an adequate investigation.

3.    The admission at trial of petitioner's inculpatory statements to the police violated petitioner's rights under Miranda.

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claims herein is set forth in 28

8

U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see also Carey v. Musladin, 549 U.S. 70, 74, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006); Smith v. Patrick, 508 F.3d 1256, 1260 (9th Cir. 2007).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. See Williams, 529 U.S. at 391, 413. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. See Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam); Williams, 529 U.S. at 405-06. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state

9

court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, 537 U.S. at 8.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or are based on 'an unreasonable determination of the facts.'" Early, 537 U.S. at 11 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. See Williams, 529 U.S. at 406-10, 413 (e.g., the rejected decision may state Strickland rule correctly but apply it unreasonably); Woodford v. Visciotti, 537 U.S. 19, 24-27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." Visciotti, 537 U.S. at 24-27; Williams, 529 U.S. at 413. An "unreasonable application" is different from an erroneous or incorrect one. See Williams, 529 U.S. at 409-10; see also Visciotti, 537 U.S. at 25; Bell v. Cone, 535 U.S. 685, 699, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002).

The Ninth Circuit has held that the same standard of objective unreasonableness applies where the petitioner is challenging the state court's factual findings under 28 U.S.C. § 2254(d)(2). See Bruce v. Terhune, 376 F.3d 950, 954 (9th Cir. 2004); Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir.), cert. denied, 543 U.S. 1038 (2004). In Taylor, the Ninth Circuit observed that "[s]uch a challenge may be based on the claim that the finding is unsupported by sufficient evidence, . . . that the process employed by the state court is defective, . . . or that no finding was made by the state court at all." Id. at 999 (internal citations omitted). In order to conclude that a state court finding was unsupported by substantial evidence in the state court record, the reviewing federal habeas court "must be convinced that an appellate panel, applying

the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." Id. at 1000.  In order to conclude that the state court fact-finding process was defective in some material way, the reviewing federal habeas court "must be satisfied that any appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Id.  Examples in this latter category are where the state court "makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence"; where the state courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim"; and where the state court "has before it, yet apparently ignores, evidence that supports petitioner's claim." Id. at 1001.  As the Ninth Circuit explained, "Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness . . . ." Id. at 1000.

The Ninth Circuit also has held that "when no reasoned state court decision denying a habeas petition exists, the federal court should perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." See Pham v. Terhune, 400 F.3d 740, 742 (9th Cir. 2005) (internal quotations omitted); Medley v. Runnels, 506 F.3d 857, 863 n.3 (9th Cir. 2007), cert. denied, 128 S. Ct. 1878 (2008); Little v. Crawford, 449 F.3d 1075, 1079 (9th Cir. 2006); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Independent review is not the equivalent of de novo review, "but rather is a style of review which views the state court decision through the objectively reasonable lens ground by Williams." Allen v. Ornoski, 435 F.3d 946, 955 (9th Cir.) (internal quotations omitted), cert. denied, 546 U.S. 1136 (2006).  Although the federal habeas court independently reviews the record, it must "still defer to the state court's ultimate decision." Id

**DISCUSSION**

11

A.   **Habeas relief is not warranted with respect to petitioner's "factual innocence" claim.**

A state prisoner is entitled to federal habeas relief only if he is held in custody in violation of the Constitution, laws or treaties of the United States. See 28 U.S.C. § 2254(a). Under Herrera v. Collins, 506 U.S. 390, 404, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993), a claim of actual innocence is not itself a cognizable constitutional claim. Rather, like the "actual innocence" claim of the petitioner in Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995), a federal habeas petitioner's "actual innocence" claim merely constitutes a possible gateway for the consideration of the petitioner's other substantive constitutional claims, to the extent that those claims might otherwise be procedurally barred. See Herrera, 506 U.S. at 416-18; see also Coley v. Gonzales, 55 F.3d 1385, 1387 (9th Cir. 1995). Here, respondent contends in her Answer that the Petition is time barred under 28 U.S.C. § 2244(d). However, the Court's conclusion hereafter that habeas relief is not warranted on the merits with respect to either of petitioner's two other substantive claims renders it unnecessary for the Court to reach the time bar defense raised by respondent (including the issue of whether the AEDPA statute of limitations even is subject to an "actual innocence" exception).

B.   **Habeas relief is not warranted with respect to petitioner's ineffective assistance of trial counsel claim(s).**

In Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice."

"Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. See Strickland, 466 U.S. at 688-89. To show "deficient performance," petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant

1   decisions in the exercise of reasonable professional judgment." <u>See</u> 460 U.S. at 690.
2   Further, petitioner "must identify the acts or omissions of counsel that are alleged not
3   to have been the result of reasonable professional judgment." <u>Id.</u>  The Court must
4   then "determine whether, in light of all the circumstances, the identified acts or
5   omissions were outside the range of professionally competent assistance." <u>Id.</u>

6       To meet his burden of showing the distinctive kind of "prejudice" required by
7   <u>Strickland</u>, petitioner must affirmatively "show that there is a reasonable probability
8   that, but for counsel's unprofessional errors, the result of the proceeding would have
9   been different.  A reasonable probability is a probability sufficient to undermine
10  confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694; <u>see also</u> <u>Williams v. Taylor</u>,
11  529 U.S. 362, 390-91, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).

12      Here, petitioner contends that his trial counsel was ineffective in the following
13  respects: (a) failing to locate a forensic expert who could analyze the taped message
14  giving rise to the Count 3 criminal threat charge, and (b) failing to have his defense
15  investigator conduct an adequate investigation.

16      For the reasons discussed hereafter, the Court finds and concludes that the State
17  courts' rejection of petitioner's ineffective assistance of trial counsel claims neither
18  was contrary to nor involved an unreasonable application of <u>Strickland</u>.

19

20      1.    <u>trial counsel's failure to locate a forensic expert who could analyze the</u>
21            <u>taped message giving rise to the Count 3 criminal threat charge</u>

22      The Court notes that petitioner has acknowledged in his Traverse that trial
23  counsel did try to have the phone message giving rise to the Count 3 criminal threat
24  charge analyzed by two "independent voice analysis experts."  Petitioner also has
25  acknowledged that both of these forensic experts "concluded that the message on the
26  tape was too short to perform a voice comparison analysis."  Trial counsel was entitled
27  to rely upon the opinions of the appropriate experts he did hire.  <u>See</u> <u>Hendricks v.</u>
28  <u>Calderon</u>, 70 F.3d 1032, 1038-39 (9th Cir. 1995); <u>see also</u> <u>Harris v. Vasquez</u>, 949 F.2d

1497, 1525 (9th Cir. 1990) ("It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts."). Given the opinions of the two independent voice analysis experts that the message on the tape was too short to perform a voice comparison analysis, trial counsel was not ineffective in "choosing to devote his time and resources to other aspects of the case." See Boyde v. Brown, 404 F.3d 1159, 1169 (9th Cir. 2005).

Moreover, in order to show ineffective assistance of counsel based on the failure to call a witness, a habeas petitioner must show that a particular witness was willing to testify (see United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir.), cert. denied, 488 U.S. 910 (1988)); must show what their testimony would have been (see United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987)); and must show that their testimony would have been sufficient to create a reasonable doubt as to guilt (see Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990), cert. denied, 498 U.S. 1091 (1991)). Here, petitioner has failed to show that, at the time of trial, another forensic expert was prepared to testify, or shown what another forensic expert's testimony would have been, or shown that the testimony of another forensic expert would have been sufficient to create a reasonable doubt as to petitioner's guilt of the Count 3 criminal threat charge. Petitioner offers nothing but speculation that another forensic expert could have been found whose testimony would have supported the defense theory that it was not his voice on the phone message.

The Court therefore finds that petitioner has failed to show either "deficient performance" or "prejudice" with respect to this ineffective assistance of counsel claim.

2.   trial counsel's alleged failure to have his defense investigator conduct an adequate investigation

Petitioner contends that the defense investigator did not properly question Morgan concerning the Count 2 assault charge (i.e., regarding the duration of the

14

assault, whether Morgan went to work the next day, and the alleged damage to her security door); that the defense investigator also did not properly question Morgan concerning the Count 1 stalking charge (i.e., regarding whether Morgan was ever afraid of petitioner, whether Morgan ever advised petitioner to leave her alone, and regarding phone calls Morgan placed to petitioner the week prior to petitioner's arrest; and that the defense investigator also did not properly question Morgan concerning the Count 3 criminal threat charge (i.e., regarding the exact time Morgan first became aware of the threatening messages left on her answering machine on March 14, 2004).[7]

However, petitioner has failed to show by competent evidence that additional investigation would have produced anything helpful to the defense. The Court therefore finds that petitioner has failed to show either "deficient performance" or "prejudice" with respect to this ineffective assistance of counsel claim.

**C.** **Habeas relief is not warranted with respect to petitioner's Miranda claim.**

The facts underlying petitioner's Miranda claim were stated by the California

---

[7]     Although this ineffective assistance claim also purports to be based on the defense investigator's failure to interview Nadvi concerning the Count 4 threat charge, it follows from petitioner's acquittal of that charge that petitioner cannot make the requisite showing of prejudice with respect to this part of his claim. Petitioner's failure to make the requisite showing of prejudice renders it unnecessary to even address the deficient performance issue. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."); see also Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002); Williams v. Calderon, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996).

Court of Appeal as follows:[8]

> [Petitioner] was arrested on March 16, 2004, and transported to
> his home where the officers conducted a search of the premises. A
> detective, Clifford Williams, advised him of his rights under <u>Miranda v.
> Arizona</u> (1966) 384 U.S. 436, but did not interrogate him at that time.
> After the search revealed the dossier [petitioner] kept on Morgan and
> the record of his surveillance of her, Williams drove [petitioner] to the
> police station, commenced a video recording of their interview, and then
> readvised [petitioner] of his rights. Williams confirmed that [petitioner]
> had read the form and understood each of the rights stated on it. At this
> point, [petitioner] asked him, "before I sign here, can I have a public
> defender from the public defender's office to be here with me?"
> Williams responded to that question with "Okay. If you're going to
> invoke your right to an attorney, I'm not going to interview you. . . . If
> you're gonna - if you want to invoke that right - go ahead and do it,
> but," to which [petitioner] interjected, "I can end the questioning at any
> time?" Williams answered in the affirmative. [Petitioner] continued to
> inquire with "Or can I refuse to answer a particular question?"
> Williams again answered in the affirmative.
>
> [Petitioner] continued this line of questions, and Williams
> ultimately asked him, "Do you want to talk about it or not?"
> [Petitioner's] response was "It depends on what it is, I'm not gonna

---

[8] This statement of the facts underlying petitioner's <u>Miranda</u> claim, which was taken from the California Court of Appeal opinion, also is entitled to a presumption of correctness. Again, petitioner has not proffered any clear and convincing evidence to rebut the presumption of correctness applicable to the Court of Appeal's statement of the underlying facts. Rather, he merely has reargued the evidence.

1
2
3
4
5
6
7
8

*incriminate myself." Finally, Williams asked him, "Do you understand*
*that if we do this interview now, I'm not gonna wait for a Public*
*Defender to come in here. I'm gonna cancel the interview."*
*[Petitioner] acknowledged his understanding but never signed the form.*
*Williams placed the word "refusal" on the blank space but testified at*
*the subsequent hearing that it was a mistake on his part to put anything*
*on the form.*

9
10
11
12

Petitioner contends that the trial court should have suppressed his inculpatory statements to the police because they were obtained in violation of petitioner's right to counsel as a result of police questioning that continued after petitioner stated that he wished to have an attorney present for the questioning.

13
14
15
16
17
18
19
20
21
22
23
24
25

A suspect who is subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning. See Miranda, 384 U.S. at 469-73; see also Davis v. United States, 512 U.S. 452, 457, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994); Michigan v. Tucker, 417 U.S. 433, 443-44, 94 S. Ct. 2357, 41 L. Ed. 2d 182 (1974). If a suspect requests counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." See Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). However, the request for counsel must be unambiguous. See Davis, 512 U.S. at 459 (holding that "Maybe I should talk to a lawyer" was not an unambiguous request for counsel). When an ambiguous or equivocal request is made, police officers are permitted to clarify whether or not a suspect actually wants an attorney. See id. at 461.

26
27
28

It is evident from the California Court of Appeal opinion that the Court of Appeal was mindful of and applied the correct standards when it rejected petitioner's

<u>Miranda</u> claim.[9]  It reasoned as follows:

> *[Petitioner] contends he invoked his right to counsel at the*
> *commencement of the interview, and Williams violated his rights by*
> *answering his questions because those answers were designed to*
> *circumvent the earlier invocation. The trial court watched the videotape*
> *of the interview and rejected this characterization of the conversation,*
> *concluding [petitioner] desired to talk with the officer and questioned*
> *him about counsel simply as an inquiry to have stand-by counsel. The*
> *court decided it was not an invocation of the right to counsel.*
>
> *On appeal, we must "accept the trial court's resolution of*
> *disputed facts and inferences, and its evaluations of credibility, if*
> *supported by substantial evidence. We independently determine from the*
> *undisputed facts, and the facts properly found by the trial court whether*
> *the challenged statement was illegally obtained." (People v.*
> *Cunningham (2001) 25 Cal.4th 926, 992.)*
>
> *If a suspect invokes his right to counsel before or during an*
> *interrogation by police, all questioning "must cease until an attorney is*
> *present." (Edwards v. Arizona (1981) 451 U.S. 477, 482.) However, an*
> *equivocal invocation or inquiry regarding the scope of the rights does*
> *not trigger cessation under federal law; discussion may continue until*
> *a clear and definite statement is uttered. (See Davis v. United States*
> *(1994) 512 U.S. 452, 462; see also People v. Crittenden (1994) 9 Cal.4th*
> *83, 124-125.) Specifically, police may answer questions posed to them*
> *by a defendant if there is a possible invocation delivered in an uncertain*

---

[9]   Under <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review raising this same claim, did not intend to change the California Court of Appeal's reasoned decision rejecting it.

*or conditional way. (E.g., People v. Johnson (1993) 6 Cal.4th 1, 27.) As was stated in Davis, the Supreme Court refused "to create a third layer of prophylaxis to prevent police questioning when the suspect might want a lawyer. Unless the suspect actually requests an attorney, questioning may continue." (Davis, supra, 512 U.S. at p. 462.) [Petitioner's] reliance on aged case law is misplaced because there is no longer independent state grounds for exclusion of evidence. (See Crittenden, supra, 9 Cal.4th at p. 129.)*

*The trial court observed the entire discussion on the videotape and found [petitioner's] questions were not the clear, unequivocal invocation mandating cessation of the interview. Moreover, this conclusion was corroborated by [petitioner's] own confirmation later in the discussion when he acknowledged that the interview would end if he wanted to wait for an attorney. He expressed his desire to talk with the officer as noted by the trial court, and there is nothing in the record to undermine that assessment.*

Based on its own independent review of the record, the Court has no basis for finding or concluding that the State courts' rejection of petitioner's Miranda claim and/or their fact-finding in connection therewith was objectively unreasonable. At the time of his arrest, petitioner was advised of his Miranda rights and said that he understood them. Detective Williams readvised petitioner of his Miranda rights at the police station, prior to the interview. It was not objectively unreasonable for the State courts to find that petitioner's initial reference to an attorney did not constitute an unambiguous request for counsel, but rather simply a request for an explanation: if he asked for counsel, would a public defender be summoned. Detective Williams properly responded that, if petitioner invoked his right to counsel, there would be no interview. It also was not objectively unreasonable for the State courts to find that

19

Detective Williams's questions and statements immediately following petitioner's initial reference to an attorney were designed to clarify petitioner's position. Petitioner made clear that he was not invoking his right to counsel by confirming that he could end the interview whenever he wanted.

**ORDER**

    IT THEREFORE IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED:  September 10, 2009

_____
ROBERT N. BLOCK
UNITED STATES MAGISTRATE JUDGE